## THE HANNA NIELSEN.

(District Court, E. D. New York. July 26, 1920.)

1. **Seamen ⬤⟞3—Contract rights governed by law of nation where contract is made.**

   Where the contract with a seaman on a Norwegian vessel was made in Norway, the Norwegian law governs his contract rights, except in so far as the procedure must conform to the laws of the United States, where they are sought to be enforced.

2. **Seamen ⬤⟞3—Law of place of personal injury governs liability of vessel.**

   Where an injury to a seaman occurs in a port of another nation, the laws of that nation determine the liability of the vessel in tort, and will be applied by its courts or by the courts of a third nation to which the vessel proceeds.

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. Seamen ⊕◯11, 29 (1)—Vessel not liable for injury beyond cost of maintenance and cure.
    A seaman on a Norwegian vessel, injured in the port of Gibraltar by the explosion of a steam gauge glass, *held* not entitled to recover compensation from the vessel under any law proved, but entitled to the expense of his maintenance and cure.

In Admiralty. Suit by Ole Tolo against the steamship Hanna Nielsen; B. Stolt-Nielsen & Co., Incorporated, claimant. Decree for claimant on claim for damages, and for libelant for maintenance and cure.

Frederick R. Graves, of New York City, for libelant.
Duncan & Mount, of New York City (Warner C. Pyne, of New York City, of counsel), for claimant.

CHATFIELD, District Judge. Tolo, the libelant, an oiler on the Norwegian steamer Hanna Nielsen, signed articles in Norway, in August, 1919. On March 16, 1919, at Portland, Me., under the effect of the United States shipping laws, Tolo made a new oral agreement for a round trip to the Mediterranean and back to the United States. In other respects with which we have to do, the terms of the shipping articles were not changed. At Gibraltar a steam gauge glass had to be removed, and the new glass installed burst as soon as the steam was turned on. Tolo was standing in front of the glass, by the direct orders of the assistant engineer, and no question of assumption of risk or contributory negligence affects the situation. This glass was some distance above the fireroom floor, and an iron grating intended for use in going to the upper part of the fireroom was directly in front. The glass in question was not shut in by any guard or metal shield, and was not of the kind generally used in the United States Navy, which has a thick glass with a prism refractor, making visible the water level from the floor below.

The testimony in the case shows that gauge glasses are apt to burst at any time without warning, that close proximity is always dangerous, that some danger exists throughout the entire fireroom, and that some risk is thus always inherent in having a runway or ladder so arranged as to compel passing in front of the glass. On the other hand, the testimony shows that most vessels, even though knowing the dangerous character of these glasses, have not adopted the more expensive and modern Klinger gauge.

Reliance is placed upon the fact that these gauges are usually above the level of the men working in the fireroom, and that the stray fragments of glass do not ordinarily cause damage. This is of itself evidence that the maintenance of these glasses is negligence. Seaboard Air Line v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475. Such negligence is a defect showing unseaworthiness. The Osceola, 189 U. S. at pages 172–174, 23 Sup. Ct. 483, 47 L. Ed. 760, and cases cited; The Lamington (D. C.) 87 Fed. 752. While sailors may assume the risk of working around an ordinary fireroom where such glasses are present (The Santa Clara [D. C.] 206 Fed. 179), this would not apply to remaining directly

in front of one of these glasses under orders, after a new glass had been installed. The negligence in such an act is under general admiralty law that of a fellow servant, when these orders are given by an officer, directing the manner of use of the appliance, and are not actionable. The Santa Clara, supra.

Tolo received a cut on the wrist, which severed a tendon, so that his third finger fell helpless toward the palm of his hand. The superficial wounds healed in response to treatment. He was taken to a doctor at Gibraltar. This doctor advised that he be taken on the ship to Genoa. He was there treated by a doctor, but was not placed in the hospital, and the physician who treated him evidently did not recognize the fact that a tendon had been cut. The wound healed externally, but Tolo suffered pain, and inability to use his finger, until he reached Norfolk. The ship there offered to send him to a hospital, but he insisted upon being sent to New York. This was done, and at New York his hospital expenses were paid (by the Norwegian consul), resulting in an operation by which the tendon of his third finger has been joined to the tendon of his middle finger, somewhere near the wrist. This has restored to him somewhat the use of his fingers, but the union of the two tendons and the adhesions of the severed end of the tendon in his wrist cause him pain, which according to the testimony will last for a long time, with some permanent injury, which interferes more or less with the use of his right hand.

There seems to be no basis for charging the captain of the vessel and the vessel itself (under the doctrine of The Troop, 128 Fed. 856, 63 C. C. A. 584) with failure to give Tolo proper treatment, nor with any inhuman conduct. Doctors were consulted. Professional advice would seem to be to blame for allowing the wound to heal, instead of performing an operation, and the conduct of the owners of the vessel, after Tolo reached the United States, indicates that they were aware of their obligation to furnish him maintenance and cure. He has received his wages for the full period of the voyage. His hospital expenses have been paid, and there may be nothing due him on this basis. The Van Der Duyn (C. C. A.) 261 Fed. 887.

This accident did not occur upon the high seas, but in a harbor within the jurisdiction of the British Empire. The question therefore arises, first, whether this court should take jurisdiction of the case at all; second, whether the laws of the United States, the laws of Norway, or the laws of Great Britain apply; and, third, how may this court obtain proof of foreign law?

As to the first point, if the accident had occurred in a harbor of the United States, the laws of the United States would apply. If the accident happened on the high seas, jurisdiction is vested in the United States courts where the vessel comes into a United States port, and where the law of the United States allows the consideration of such a cause of action. The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; The Cuzco (D. C.) 225 Fed. 169, and cases therein cited; The Osceola, supra. But in such a case the laws of the nation whose territory is represented by the vessel, and where the accident occurred, will be considered in establishing the rights and liabilities of the parties.

The Lamington, supra;. The Cuzco, supra; The Belgenland, supra; Chelentis v. Luckenbach; 247 U. S. 372, 38 Sup. Ct. 501, 62 L. Ed. 1171.

A sailor upon a foreign vessel upon the high seas could not invoke the laws of the United States as the sole measure of the rights which he there enjoyed. Even though the vessel sailed from the United States, under a contract made in the United States for the services of the seaman, United States law would apply only in so far as the terms of the contract might bring in the United States law, and in so far as the maintenance of the action in the United States might have to do with the enforcement of the remedy.

[1] In the present case the contract in general was the one made in Norway, and Norwegian law applies to the contract rights of the sailor in all respects, except in so far as the procedure must be governed by the laws of the United States. But in considering a claim of tort the fact that the accident occurred in a British port alters the situation. The Lamington, supra, The Cuzco, supra; The Scotland, 105 U. S. 24, 26 L. Ed. 1001.

[2] As has been said, when an accident happens within the confines of a nation's jurisdiction, the laws of that nation apply and will be administered by its courts. When a vessel sails away from that port, and reaches the port of a third nation, the courts of this third nation cannot substitute its own law for the establishment of the rights of the parties, which have already been fixed. It can only apply the laws of the country where the accident happened. Nor would compensation laws of the country owning the vessel defeat the general maritime law, which establishes a liability for tort against the vessel, if that is given by the law of the place where the negligence occurred. Chelentis v. Luckenbach, supra.

[3] In the case at bar the original sailing articles were modified in certain respects in the United States, but no contract was made to have the Norwegian vessel governed by either United States or British law. In Gibraltar, the British law as to rights arising ex delicto governed the situation, and the La Follette Law would not be in effect to any extent beyond that to which the contract was actually modified in accordance therewith. When the steamer left Gibraltar its liability would be governed by Norwegian law, rather than by British. But under the Norwegian law, if that were applicable, the libelant cannot recover damages, nor any maintenance and cure beyond that which he has received. He is fortunate that the surgical skill shown by the surgeons in the Long Island Hospital in Brooklyn was sufficient to insure him partial recovery. But this court cannot fix any liability on the vessel for more than has been done, under the Norwegian law as proven on the trial.

This makes it necessary to consider what rights he might have under the British law of Gibraltar. The libelant claims that no proof of what is in the British law was needed, inasmuch as the court can take judicial notice of what is the common law of both the United States and Great Britain, and that a presumption exists against changes in the common law unless affirmatively shown by the claimant. Cuba

R. Co. v. Crosby, 222 U. S. 473, 32 Sup. Ct. 132, 56 L. Ed. 274, 38 L. R. A. (N. S.) 40. Panama Electric Ry. Co. v. Moyers, 249 Fed. 19, 161 C. C. A. 79.

While this court may take judicial notice of what is the common law, in so far as this common law is proven to exist in the United States and in Great Britain, unmodified by statute, it is difficult to say where such presumption would lead. At common law the act in question would be that of a fellow servant. Admiralty is not common law. In admiralty the question is limited to the seaworthiness of the vessel, and the doctrine of fellow servant cannot be invoked, unless appliances to render the vessel seaworthy are at hand, and improperly or negligently used by those on the vessel who are properly to be classified as fellow servants. The laws of a foreign country must be pleaded and proven. Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; The Santa Clara, supra; Cuba R. R. Co. v. Crosby, supra. The libelant has not alleged or proven the laws of Gibraltar. On the contrary, he has alleged, but not proven, that the laws of Norway require guards over such glasses on vessels.

It is difficult to avoid the conclusion that, where proof could be so readily furnished as in the case of these statutes, failure to offer such proof should carry an inference strongest against the person who does not offer the proof. The court is unwilling to establish a presumption that laws which may have been in force in a foreign country more than 133 years ago are still unmodified, when the party relying on such presumption shows unwillingness to give exact proof. The libelant insists that a duty rests on the claimant to prove any modification of the common law, but this court cannot see that this clarifies the situation. Until the libelant proves some law, no presumption at all can arise as to the subsequent course of that law.

The libel must be dismissed as to the alleged causes of action for damages. Decree and reference may be had for any items of maintenance and cure, such as was ordered by the Circuit Court of Appeals in the case of The Van Der Duyn, supra, and The Santa Clara, supra.